UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TAMMY L. SALISBURY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-531-DBH |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER, | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant | ) | |

# REPORT AND RECOMMENDED DECISION

In this action, Plaintiff Tammy L. Salisbury seeks disability insurance benefits under Title II of the Social Security Act. Defendant, the Social Security Administration Acting Commissioner, found that Plaintiff has a severe impairment, but retains the functional capacity to perform substantial gainful activity, including her past relevant work. Defendant, therefore, denied Plaintiff's request for disability benefits. Plaintiff filed this action for judicial review of Defendant's final administrative decision pursuant to 42 U.S.C. § 405(g).

Following a review of the record, and after consideration of the parties' arguments, I recommend the Court affirm the administrative decision.

## THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the September 17, 2015, decision of the Administrative Law Judge (ALJ) (ECF No. 9-2).[1] The ALJ's decision tracks the familiar

---

[1] The Appeals Council found no reason to review the ALJ's decision. (R. 1.).

five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. § 404.1520.

The ALJ found that Plaintiff has a severe, but non-listing-level impairment: sleep disorder. (Decision ¶¶ 3 – 4.) The ALJ determined that Plaintiff has the residual functional capacity (RFC) for the full-range of exertional activity, but must avoid heights, hazardous machinery, motor vehicle operation, and sharp instruments. (*Id.* ¶ 5.) The ALJ further found that with her RFC, Plaintiff has the capacity to perform past relevant work and other substantial gainful activity. (*Id.* ¶ 6.) The ALJ, therefore, concluded that Plaintiff was not disabled from January 12, 2012, through the date of decision, September 17, 2015. (*Id.* ¶ 7.)

## PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff asserts that the ALJ's step 2 characterization of Plaintiff's condition as a sleep disorder is erroneous. Citing the findings of several treating neurologists, Plaintiff contends the proper diagnosis is narcolepsy. (Statement of Errors at 1 – 4.) Plaintiff argues the step 2 error led to error at step 3 because the proper listing for evaluation of narcolepsy is Listing 11.02 (epilepsy), not Listing 3.10 (sleep related breathing disorders). (*Id.* at 3.) Plaintiff maintains her condition is equivalent to a condition that would meet Listing 11.02. (*Id.* at 4 – 6.)

Plaintiff also challenges the ALJ's RFC finding, and argues the ALJ improperly relied on the state agency non-examining expert who diagnosed sleep disorder (Susan Moner, M.D.), improperly weighed the findings of a treating source (James Stevenson, M.D.), and improperly assessed Plaintiff's credibility regarding her report of her subjective

symptoms. (*Id.* at 8 – 18.)

## DISCUSSION

### A. Standard of Review

A court must affirm the administrative decision provided that the ALJ applied the correct legal standards and provided that the decision is supported by substantial evidence, even if the record contains evidence capable of supporting an alternative outcome. *Manso-Pizarro v. Sec'y of HHS*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); *Rodriguez Pagan v. Sec'y of HHS*, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of HHS*, 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

### B. Analysis

#### 1. *Narcolepsy at step 2*

At step 2, the ALJ found that Plaintiff has a sleep disorder that causes more than a slight restriction in her ability to perform basic work-related activities. (Decision ¶ 3.) In his discussion of Plaintiff's RFC, the ALJ noted "a history of narcolepsy dating back to age 13," but also observed that "the record fails to show that her condition worsened on her alleged onset date." (R. 17.) According to Plaintiff, although she managed her condition with medication for years, the medication became ineffective and her symptoms became unmanageable for employment purposes because she "came down with insomnia."

(R. 45 – 46.) "The medication that worked before … was no longer working because [she] was falling asleep without knowing it on the medication." (R. 47.)  Plaintiff received a series of neurological evaluations in 2010 and 2011, following her report of symptoms such as blackout episodes, loss of time, and resulting loss of employment.  (Ex. 3F, R. 268.)

On September 8, 2011, Maine Disability Determination Services consulting physician Robert Hayes, D.O., reported: "Although the claimant reports long history of narcolepsy, this diagnosis is not confirmed by consulting neurologists' records." (Ex. 1A, R. 61.)  He then provided an RFC assessment for sleep disorder, which assessment was somewhat more restrictive than the RFC assessed by the ALJ.  On November 25, 2013, Maine Disability Determination Services consulting physician Susan Moner, M.D., found Plaintiff to have a severe sleep-related breathing disorder and provided an RFC assessment consistent with the ALJ's finding.  (Ex. 3A, R. 71 – 72.)

On April 22, 2014, in connection with a request for reconsideration, consulting physician Donald Trumbull, M.D., found that the record contained "no objective evidence of neuromuscular or other neural pathology explaining claimant's symptomatology," that there were no current exams or tests confirming Plaintiff's narcolepsy/cataplexy diagnosis, and that Plaintiff's current issues are based exclusively on her subjective statements.  (Ex. 5A, R. 81.)  The Social Security Administration upheld the denial of benefits.

A claimant bears the burden of establishing the existence of severe conditions, but the burden is *de minimis*.  *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1123 (1st Cir.1986).  An impairment is not severe if it does not significantly limit the claimant's ability to do basic work activities.  20 C.F.R. § 404.1521(a).  Impairments

found to be severe at step 2 are then evaluated in relation to the Listing of Impairments in appendix 1, subpart P of 20 C.F.R. part 404, at step 3, to determine if they are severe enough to automatically qualify for disability benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If an error is made in identifying severe impairments at step 2, the error is harmless on appeal, unless the plaintiff can demonstrate that, but for the error, there would have been a different resolution of the claim. *Bolduc v. Astrue*, No. 1:09-cv-00220, 2010 WL 276280, at *4 n.3 (D. Me. Jan. 19, 2010) ("[A]n error at Step 2 is uniformly considered harmless, and thus not to require remand, unless the plaintiff can demonstrate how the error would necessarily change the outcome of the plaintiff's claim.").

At step 2, only medical evidence may be used to support a finding that an impairment is severe. 20 C.F.R. §§ 404.1528, 416.928.

> No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

Social Security Ruling 96–7p, 1996 SSR LEXIS 4, *1, 1996 WL 374186, *1. "Symptoms are [a claimant's] own description of [his or her] physical or mental impairment." 20 C.F.R. §§ 404.1528(a), 416.928(a). A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." *Id.* By contrast: "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." *Id.* §§ 404.1528(b), 416.928(b).

The Social Security Program Operations Manual System (POMS) defines

narcolepsy as follows:

> Narcolepsy is a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:
>
> 1. Cataplexy – attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.
>
> 2. Hypnagogic hallucinations – hallucinations which occur between sleep and wakening.
>
> 3. Sleep paralysis – a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

Evaluation of Narcolepsy, POMS DI 24580.005. Plaintiff argues her disorder is narcolepsy, not sleep disorder, and notes that the opinion on which the ALJ relied (Dr. Moner, Ex. 3A) did not consider more recent findings of James Sears, M.D., which findings are supportive of the narcolepsy diagnosis.

Although narcolepsy is a consistent diagnosis in Plaintiff's treatment records with James Stevenson, M.D., a dispute exists as to whether clinical findings in the record support the diagnosis. Dr. Stevenson diagnosed narcolepsy with cataplexy and insomnia unspecified, and prescribed, inter alia, Provigil, Xyrem, and Zoloft. (Ex. 8F, R. 298.) In making the diagnosis, Dr. Stevenson evidently credited subjective reports of cataplexy, hypnogogic hallucinations, sleep paralysis, and daytime sleep attacks. (E.g., R. 299.) The consulting physicians, however, concluded that the diagnosis is not supported by clinical findings.

Plaintiff's medical records conclude with a report of neurological consultation with Dr. Sears. (Ex. 16F.) Plaintiff argues that Dr. Sears's report contains new clinical findings

6

supportive of the narcolepsy diagnosis and that the ALJ was thus required to defer to the narcolepsy diagnosis or obtain a further expert opinion on the matter. Dr. Sears's report, however, does not disclose new clinical findings. Dr. Sears's report contains a longitudinal history of Plaintiff's care beginning in 2007. Dr. Sears's impression of Plaintiff's history is as follows:

> The patient has a history strongly suggestive of narcolepsy syndrome with cataplexy and also has sleep paralysis and sleep onset dreaming. Neuro-physiologic studies are confirmatory with sleep onset REM periods in both polysomnographic evaluation and multiple sleep latency with severely shortened mean sleep latency.

(R. 394.)

Dr. Sears notes Plaintiff stopped taking medication (Provigil), and relied on naps to address her symptoms, which approach evidently resulted in Plaintiff's inability to remain awake throughout a work day. (R. 392.) Dr. Sears describes a plan by which Plaintiff's symptoms of nighttime "sleep paralysis and sleep fragmentation and sleep onset dreaming," would first be treated with graduated doses of protriptyline. (R. 394.) Dr. Sears proposed that following that treatment, Provigil would be reintroduced during the day. (Id.)

The ALJ credited the conclusions of the Disability Determination Services' consulting physicians that narcolepsy is not established in the clinical record. Given that Dr. Sears determined Plaintiff's symptoms to be "strongly suggestive of narcolepsy syndrome," but did not definitively diagnose narcolepsy, Dr. Sears's assessment is not necessarily inconsistent with the conclusions of the consulting physicians. On this record, therefore, the ALJ did not err when, upon reliance on the consulting physicians, he did not

7

determine at step 2 that Plaintiff suffered from narcolepsy. Even if the ALJ erred, however, and should have determined that Plaintiff suffers from narcolepsy, Plaintiff has not established that her condition qualifies under a Listing as she asserts.

   *2.     Narcolepsy at step 3*

"The burden to demonstrate the existence of [a listing-level] impairment rests with the claimant." *Dudley v. Sec'y of Health & Human Servs.*, 816 F.2d 792, 793 (1st Cir. 1987) (per curiam). Even if the Court assumes the ALJ erred at step 2, the listing analysis at step 3 reveals that Plaintiff's claim fails.

There is no Listing for narcolepsy. The POMS provides that "the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy." POMS DI 24580.005. The epilepsy listing requires the consideration of the frequency of seizure activity "despite adherence to prescribed treatment." Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, § 11.02.

The record does not support a finding that Plaintiff suffers from epilepsy or has experienced any epileptic seizures. An EEG study performed on December 17, 2010, was "a fully normal study" and "episodes of blackouts [were] not accounted for by this regular EEG recording." (Penobscot Bay Neurology, Bruce Sigsbee, M.D., Ex. 3F, R. 268.) Upon follow-up and Plaintiff's report of memory and attention deficits, an MRI study was obtained. (Ex. 4F, R. 270.) Dr. Sigsbee references an earlier 48-hour ambulatory EEG that failed to detect "any epileptic or epileptiform features." (Ex. 5F, R. 271.)) According to Dr. Sigsbee, there was no "objective evidence of epilepsy or other similar disorder;" Plaintiff's symptoms were of uncertain origin and were "not easily ascribed to her

8

narcolepsy;" and Plaintiff's symptoms could be reflective of a "pseudodementia probably related to depression." (R. 272.) Dr. Sigsbee recommended neuropsychological testing. (*Id.*) Plaintiff underwent overnight polysomnography in June 2011. (Ex. 7F.) "No epileptiform activity was noted during the study." (R. 295.)

Dr. Stevenson's treatment records from February 2011 through August 2013 reflect continuing efforts to manage symptoms through medication, and the records reveal that Plaintiff could function when she was compliant with her medication. Thus, even if the Court assumes Plaintiff's reported symptoms (e.g., blackout episodes, loss of time) qualify as seizure activity, the record reflects that medication managed the symptoms to enable Plaintiff to remain awake during the day and function. During the period of her treatment with Dr. Stevenson, however, Plaintiff discontinued Provigil, the medication prescribed to combat daytime sleepiness. (Ex. 11F.) Because the Epilepsy Listing requires seizure activity "despite adherence to prescribed treatment," Plaintiff's condition would not be equivalent to the Listing, even if the ALJ had determined that Plaintiff suffers from narcolepsy.

In sum, the record simply lacks any credible evidence to suggest that Plaintiff's symptoms are equivalent in degree to the epilepsy impairments described in Listing 11.02. Plaintiff, therefore, has failed to establish that the Listing applied even if the ALJ determined she suffered from narcolepsy.

### 3. *Residual functional capacity*

Plaintiff's records and her testimony demonstrate that the function-related limitations she attributes to her impairment were controlled by medication, at least until

she began to experience insomnia in or around 2012. Furthermore, the consulting physicians (Hayes, Moner, and Trumbull) who offered RFC opinions that the ALJ considered, reached their conclusions after review of the longitudinal treatment record, including the sleep studies in 2010 and 2011. The medical opinions, which are supported by competent medical record evidence, constitute substantial evidence to support the ALJ's RFC finding. In contrast, Plaintiff's challenge to the ALJ's RFC finding is not supported by expert opinion evidence as to the manner in which her impairments impact her functioning. As observed by the ALJ, "[t]here are no treating or examining source opinions to corroborate the claimant's allegations or to contradict the findings of the state agency doctors." (R. 18.) Under the circumstances, the ALJ did not err in his assessment of the medical evidence of record and in his RFC determination.

### 4. *Credibility*

Plaintiff argues the ALJ failed to assess properly the credibility of her testimony and reports regarding the onset date of her disability, her compliance with medications, and her activities of daily living. In essence, Plaintiff contends the ALJ's credibility determinations are not supported by the record.

"Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965). *See also Shaw v. Sec'y of Health & Human Servs.*, No. 93–2173, 1994 WL 251000, * 4, 1994 U.S. App. LEXIS 14287, *14–15 (1st Cir. 1994) (unpublished) ("Where the facts permit diverse inferences, we will affirm the [Commissioner] even if we might have reached a different result.").

While Plaintiff might cite evidence that could arguably be construed as consistent with her reports and testimony, the ALJ's credibility findings are supported by the record. For instance, the ALJ noted credible evidence of Plaintiff's ability to sleep and function soon after her alleged onset date, Plaintiff's ability to work on a part-time basis in her business, and records which reflect she stopped taking her medication (Provigil) at various times. The ALJ also considered a range of activities of daily living, and concluded that the evidence established that Plaintiff was "quite functional, even operating her own business albeit on a part time basis." (R. 17.) In short, as part of the credibility assessment, the ALJ reviewed the relevant record evidence, and the record evidence supports the ALJ's assessment.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court affirm the administrative decision.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated this 7th day of July, 2017.

/s/ John C. Nivison
U.S. Magistrate Judge